[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION NATURE OF THE PROCEEDING
This is a judicial inquiry into the professional practices of Attorney Nancy Burton which occurred before, during and after completion of the trial of an action for a declaratory judgment and injunction, which action underlies this proceeding under the same caption and style. The inquiry was set in motion by two separate incidents: (1) receipt by the court of a written communication from two of the plaintiffs; and (2) information from defendants' counsel that they had learned through discovery that several plaintiffs had not authorized the lawsuit. Acting upon this information the court, sua sponte, initiated its inquiry, or investigation, into Attorney Burton's practices. In doing so "the court [endeavored to] control[s] the situation and procedure, in its discretion, as the interests of justice may seem to it to require." Inre: Peck, 88 Conn. 447, 452 (1914). The court availed itself of its seldom used power, acting on its own motion, without a complaint, and thus became the initiator of the proceedings. Grievance Committee v.Goldfarb, 9 Conn. App. 464, 471 (1987). The clearly stated purpose of the proceeding was, of course, to determine whether any of the Connecticut Rules of Professional Conduct (hereinafter "the Rules") had been violated.
Because this is a disciplinary or grievance type proceeding, the standard of proof is by clear and convincing evidence. StatewideGrievance v. Dickson, 62 Conn. App. 507, (2001). As appears from the court's analysis below, evidence of each and every violation found to have been committed more than amply satisfies this standard and the court hereafter finds all facts by clear and convincing proof.
 PROCEDURAL BACKGROUND
On June 30, 2000, this court filed its memorandum of decision granting the defendants' motion to dismiss the first two counts of the plaintiffs' complaint. In late July, the court received from the plaintiffs, Joseph CT Page 9347 and Lenore Sullivan (hereinafter "the Sullivans") a copy of a letter which they had sent to Attorney Burton under date of July 18, 2000. That letter contained, in part, the following statements quoted verbatim.
 "The purpose of this letter is to inform you in writing what Lenore and I told you on Sunday evening, July 16th, namely, that we do not wish to be active participants in any legal actions to make motion to reargue the Memorandum of Decision by Judge Mottolese, dated June 30th We do not want to appeal the Decision in anyway. Furthermore, we agree with the Judge's findings, and feel we have had our day in court, so to speak, on the action for a temporary and permanent injunction seeking to prevent commencement of development of a resubdivision consisting of 18 residential building lots.
 In summary, Lenore and I do not want to be part of any further legal actions to make motions to reargue, or change, or amend any part of Judge Mottolese Memorandum of Decision. I hope I have left no room for doubt as to my desire on legal actions NOT to be taken here.
 Following any decision on the Motion to Dismiss, I would like to discontinue any further legal services by you, and I thank you for your efforts on our behalf."
At a hearing held September 28, 2000 on pending motions for sanctions which had been filed by the defendants, it was brought to the court's attention that at least one (Katherine M. Finch) and possibly other named plaintiffs may not have authorized their names to be used in the lawsuit as parties plaintiff. Attorney Burton did not attend this hearing.[1]
Acting on these claims, the court sent notice of hearing for October 31, 2000, defining the scope of the proceeding as including: all motions for sanctions, motions for allowance of counsel fees by parties appearing at the September 28th proceeding; the Sullivan letter described above; Attorney Burton's motion to withdraw as counsel. At the same proceeding, the court noted at the outset, receipt of the plaintiffs' motion to vacate and reargue the fine and was prepared to proceed to hear the motion as a threshold to the other noticed motions when Attorney Burton handed the court a motion to disqualify this particular judge. At the conclusion of the proceeding, the court denied the motion to disqualify, reaffirmed its order of September 28 and awarded counsel fees of $450 to each of the defendants' attorneys pursuant to P. B. § 5-10.[2]
Thereupon, the court ordered a hearing for November 21 at which time the court would hear all pending motions for sanctions as well as hear from the Sullivans who had requested an opportunity to present evidence to the court on the subject of their letter of July 18, 2000. The court also CT Page 9348 ordered a second hearing for November 29 for the purpose of taking evidence concerning the claims of defendants' counsel that numerous plaintiffs had not authorized Attorney Burton to include them as parties to this lawsuit.
At the November 29 proceeding the court noted that the plaintiffs had filed two motions that morning: a second motion to disqualify the court and a revised motion for sanctions. The court denied the motion to disqualify and ordered Attorney Burton to contact all plaintiffs to determine whether they wished to pursue this action any further and to report the plaintiffs' wishes to the court within one week. At the same proceeding, the court identified two additional issues which it felt constrained to address, viz: (1) whether Attorney Burton continued to participate in the litigation without the consent of her clients; (2) whether Attorney Burton's allegations of gender bias against the court should be referred to the grievance committee for its attention or whether the court itself should take further action, sua sponte.
On the next court date, December 11, the court learned that Attorney Burton had not communicated with any of the plaintiffs within the prescribed one week's time but rather had filed a motion for extension of time seeking an additional week to do so. The court noted that the motion was dated one full week after the deadline fixed by the court. No good cause was shown for the noncompliance and the motion was denied.
During the course of that proceeding the court perceived that the real reason for Attorney Burton's noncompliance was because she was concerned that if her clients withdrew the action she herself or her third party recognizance, W. H. Honan. would be exposed to taxable costs, fees and other expenses pursuant to chapter 901 of the General Statutes and §8-4 of the Practice Book. Thus, another issue emerged which merited judicial attention, namely, whether a conflict existed between Attorney Burton's duty of loyalty to her clients and her desire to protect herself from costs, fees and expenses.
At the continued hearing held December 12, the court heard from certain plaintiffs who had been subpoenaed by the defendant, Hammertown Estates, LLC. ("hereinafter Hammertown"). On the basis of their testimony, the court concluded that none of them desired to continue to participate in the lawsuit. At various times thereafter each of them filed withdrawals of action on form JD-CV-41.[3] The hearing was continued to December 21, 2000. When the court announced the first witness of the day, Attorney Burton interrupted by filing a third motion to disqualify the court and a motion to suspend proceedings which the court declined to consider at that particular time. The court then proceeded to hear the testimony of the subpoenaed plaintiffs as well as that of the Sullivans[4] The CT Page 9349 hearing carried over to December 22.
At the January 4, 2001 continuation of the proceeding the court acknowledged receipt of a letter from plaintiffs, Edith and Irving Nelson, in which they stated their wish no longer to be involved in the case. Soon thereafter Attorney Burton moved orally for the court's recusal (41h such motion) which the court denied. Thereafter, Attorney Burton testified in her own behalf and continued her testimony on January 5, 9, 10, 11 and 12. Thereupon, the court fixed three weeks from the production of complete transcripts for the filing of briefs. The filing date thus became March 30, 2001. Each defendant timely filed its brief addressing the facts and the rules of professional conduct which each believed apply to the facts. Attorney Burton filed a `Preliminary Brief' on March 16 and a `Supplemental Brief' on March 30. Neither document addresses either the facts or the applicable rules of professional conduct. At the conclusion of the hearing and thus, its inquiry, the court identified, without limitation, several rules of professional conduct which it believed had been implicated by the evidence, inviting the participants to bring to the court's attention any other rule which the court should consider.
The following are the court's findings of fact and conclusions of law.
 I Unauthorized Representation
A. Before and During the Trial
In an effort to forestall further use of a piece of construction equipment known as a "rock crusher" within the defendant, Hammertown's subdivision, the Sullivans organized a meeting of residents of the affected Monroe neighborhood who had similar interests. The meeting was held on December 22, 1999 at a local restaurant known as "Roberto's". The Sullivans prepared sign up sheets which were designed to record an attendee's interest in becoming a co-plaintiff (with the Sullivans) in an appeal to the Superior Court from the action of the Monroe Zoning Board of Appeals in granting a waiver so as to permit "rock processing equipment to be placed" within the Hammertown subdivision. Attorney Burton made an oral presentation to the group which included an explanation of the principle of aggrievement in so far as that principle related to noise, dust, inconvenience, to which their properties would be exposed.
The scope of the discussion at the meeting was limited to that appeal.[5] There was no discussion, and therefore no sign up sheet, which was intended to authorize the bringing of an action for CT Page 9350 a declaratory judgment or an injunction. Twenty of the twenty two plaintiffs in this case signed these sheets (the Sullivans did not sign). It became unmistakably clear from those who testified that not one of these persons understood that by so signing they were also authorizing their names to be used as plaintiffs in this action. In fact, there was extremely persuasive evidence that instead of lending their names to litigation, they honestly believed that they were doing nothing more than signing a petition for presentation to the Monroe municipal land use authorities urging those authorities to enforce strictly all of the applicable municipal regulations. Moreover, some of them were not actually aware of their participation in this action until subpoenaed to depositions in this case by the defendants in October 2000.
Attorney Burton, therefore, failed to explain the nature and scope of this proceeding adequately. In fact, the record is clear that she did not explain it at all. Specifically, Attorney Burton failed to explain to them their exposure to taxable costs pursuant to our statutes and that if so taxed they would have to look to the Sullivans for indemnification. While the Sullivans agreed to assume all costs of litigation, she failed to explain to them that such an assumption might include an apportionment of separate costs taxed against each of the other plaintiffs. At least two plaintiffs (Leon and Cynthia Ambrosey) believed that she was retained only by the Sullivans and by no one else who had attended the meeting, least of all them. Further, she failed to explain the meaning and purpose of the sign up sheet but assigned that responsibility to the Sullivans. Further, Attorney Burton failed to explain the inherent potential for conflict among the plaintiffs and what their options would be in the event that a conflict eventuated. For instance, the evidence showed that at least three of the plaintiffs exhibited primary concern over different matters viz: the Hunters were concerned with their rights to a pond: the Sullivans, the rock crusher: Jule Toma, air quality. It should have been obvious to Attorney Burton that a resolution of the issue involving the rock crusher may not have satisfied the Hunters or Ms. Toma.
"Because the danger of a conflict of interest is inherent in a multiple representation, an attorney must disclose more than the fact that he [she] is undertaking to represent more than one client. Full disclosure requires the attorney to explain to the client in detail the risks and the foreseeable pitfalls that may arise in course of the transaction so that the client can understand the reasons why it may be desirable for him or her to have independent counsel". Atcheson v. White,195 Conn. 211, 215 n. 5 (1985).
Prior to the institution of this action Attorney Burton did not meet personally with any of the plaintiffs to verify such matters as their CT Page 9351 identity[6] or the extent, if any, of their desires to pursue this litigation or their goals and objectives. Nor did Attorney Burton make any effort to confer with them either individually or as a group for any purpose during the pendency of the litigation. Instead, she delegated to the Sullivans the responsibility for communicating with the plaintiffs. During the course of her testimony, Attorney Burton claimed that a certain letter from Mr. Sullivan to the then plaintiffs, dated December 27, 1999, constituted written notice to them of the commencement of this action. In fact, the letter makes no mention of the impending commencement of this action. Such a statement is an outright misrepresentation of the contents of the letter. Moreover, Attorney Burton claims to have acted to commence the case in the names of these plaintiffs on the strength of a "telephone call" from Mr. Sullivan who assured her that he had obtained their verbal authorizations.
The use of a lay intermediary for such purpose constitutes an abdication of an attorney's professional engagement. Because there had never been an attorney client relationship between the plaintiffs and Attorney Burton the court inquired concerning her compliance with § 1.5(b) of the Rules.[7] In reply to the court's persistent questioning, Attorney Burton claimed to have complied with the requirements of § 1.5(b) by assuring the December 22 attendees that the Sullivans would assume all expenses of litigation and such assurance, limited as it was to matters of financial responsibility, overlooked the other important requirement of the rule that there be an explanatory writing from the attorney to the client. It is obvious that an oral communication may not be considered the functional equivalent of a written communication as within the meaning of the rule.
The court concludes that Attorney Burton had no authority to institute this action on behalf of any of the twenty two plaintiffs except for the Sullivans and the Hunters.[8] The court further concludes that Attorney Burton failed to comply with Rule 1.5(b) in that she knowingly and deliberately chose to circumvent the rule by interpreting it to be inapplicable to this factual situation. Attorney Burton's effort to exempt herself from the rule is unavailing. The court cannot take seriously her contention that an exemption arises by reason of her prior representation of the plaintiffs in the "rock crusher" appeal for the obvious reason that if she was at all authorized to include the plaintiffs in this case, that authorization originated at the very same time as her authorization for the "rock crusher" appeal, so there could have been no "regular representation" within the meaning of the rule.
The court finds that the above described conduct also constitutes a violation of Rule 1.7(b)(2)[9] because no consultation concerning "implications" and "risks" ever occurred. Attempted compliance through CT Page 9352 Mr. Sullivan constituted an improper delegation of responsibility by an attorney to a layperson of the performance of duties that should have been performed by the attorney herself.
Attorney Burton argues that if these plaintiffs were truly unaware that they had given the necessary authorization they should have become aware of their status by virtue of the copies of pleadings which she mailed to them at different times during the course of the litigation. The problem with this is that the pleadings do not contain the plaintiffs' names so there was no means by which they could have discovered their participation through the vehicle of a pleading. The fact that their names appear as part of a certification of service would offer no clarification to a layperson. The fact that Attorney Burton wrote letters to the plaintiffs in June, July and August 2000 would not constitute adequate notice because they were sent long after the court had under adjudication and ultimately dismissed two of the three counts of the complaint.
The court concludes that these plaintiffs[10] were unaware of their status as plaintiffs until October 2000 when they were subpoenaed to give depositions and that this lack of information concerning so fundamental a matter constitutes a violation of Rule 1.4.[11] The court finds that such violation was willful.
During the course of their depositions these plaintiffs each expressed a desire to be dropped from the case. Thereafter, David Boston personally so informed Attorney Burton by telephone. The court concludes that Attorney Burton knew or reasonably should have known at that time that these particular plaintiffs desired to withdraw and failed to follow her clients' instructions in violation of Rule 1.2(a) and (c).[12] Such violation was willful.
B. After Completion of the Trial
1. Clients' Instructions.
Shortly after issuance of this court's decision of June 30, 2000 the Sullivans advised Attorney Burton by several separate means of communication that they no longer wished to pursue this action viz: by telephone conversation on July 16, 2000, by letter on July 18, 2000, by telefax on July 19, 2000 and letter and E-mail on July 21, 2000. These communications were explicit, unequivocal and forceful in the message which they intended to convey to Attorney Burton. They not only wanted a cessation of litigation, but they made it unambiguously clear that they intended to forbid Attorney Burton from filing any further pleadings, especially any motion to reargue the June 30 decision. They thereby intended to "discontinue" the engagement of Attorney Burton. The E-mail CT Page 9353 of July 21 expresses the Sullivans' displeasure in learning that, notwithstanding their several communications, Attorney Burton nevertheless filed a motion to reargue this court's decision in disobedience of their wishes. Thereupon, they demanded that she remove their names from the motion and inform the court of their wishes. In defiance of her clients' instructions Attorney Burton failed to comply. Bearing in mind that the evidence showed that Attorney Burton had offered to continue to pursue this case without fee, the conclusion is inescapable that such defiant behavior was willful and intentional.
But Attorney Burton's defiant behavior in this case is hardly limited to the filing of the motion to reargue. The fact is that she filed a total of 35 "pleadings" after being instructed by the Sullivans not to do so. While it may be true that some of the pleadings were designed for Attorney Burton's sole benefit in that they sought reversal of past sanctions or protection from future sanctions, all of the them were filed in flagrant disobedience of her clients' instructions and wishes. In a final effort to put an end to further activity by Attorney Burton, the Sullivans requested that the Appellate Court remove their names from her appeal of this court's sanction orders of September 28 and October 31, they not having authorized the taking of such appeal.
Attorney Burton endeavored to justify her actions by characterizing the Sullivans' decision as "confused, stupid, foolish". She attributed such mental condition to intimidation upon the Sullivans by defense counsel and the court. It is fundamental that an attorney has no right to substitute his or her judgment for that of the client with respect to the duration of litigation. The conduct of Attorney Burton in flaunting the explicit instructions of her clients, the Sullivans, was calculated and willful and violated Rule 1.2 supra and Rule 1.16(a)(3).[13]
2. Uncommunicated Settlement Offers
On November 20, 2000 the defendant, Town of Monroe made a written offer of settlement to Attorney Burton which included a waiver of all claims for fees and costs to which it might be entitled as a prevailing party in the lawsuit and a waiver of the $450 counsel fees awarded by the court as a sanction. On a previous occasion in open court, the town of Monroe withdrew its motion for sanctions against the plaintiffs. On November 2, 2000 the defendant
Hammertown made a similar offer in writing. Attorney Burton failed to communicate either offer to any of the plaintiffs and offered no plausible justification for such omission. Such an omission is found to have been willful and not an act of neglect. Such an omission constitutes a blatant violation of Rules 1.2 and 1.4.[14]
CT Page 9354
3. Withdrawals
Attorney Burton failed to advise the other plaintiffs that the Sullivans had notified her in July to take no further action in the case. Such information was vitally important to the other plaintiffs so that they could have decided whether to continue prosecuting the action on their own or withdrawing as they eventually opted to do. This was especially acute in this case where the Sullivans assumed to pay all costs and fees and the other plaintiffs were expected to pay nothing. Had Attorney Burton done so, they most certainly would have protested three months earlier that they had been made plaintiffs without their knowledge or consent and could have then and there terminated their connection with the suit. Such conduct was in violation of Rule 1.4.[15]
 II. Conflict of Interest.
A. Other Plaintiffs
In the discussion of unauthorized representation by counsel in part I of this opinion the court has noted the conflict which was created at the time that the Sullivans communicated their desire to discontinue the litigation. Another area of conflict arose when Diane Mellon paid Attorney Burton $1000 with the intention of joining the action as a party plaintiff. Attorney Burton failed to add her as a plaintiff. Attorney Burton never notified the other plaintiffs of her receipt of this sum nor obtained their consent after consultation. Such conduct violates Rule 1.8(f)[16] and 1.4, supra. The violation of these rules was clearly willful.
It became distinctly clear that in filing numerous pleadings in direct contravention of Sullivans' instructions to the contrary, Attorney Burton was motivated by a twofold consideration. First, the court is aware from its period of judicial service, that Attorney Burton is recognized as having attained a level of success in forestalling, curtailing and delaying certain land development projects in our state. In this case, Attorney Burton identified wetlands and natural features of the subdivision terrain which she believed ought to be protected. The sullivans evinced no concern over these and only the Hunters were concerned over the pond. Thus, Attorney Burton exploited her clients' mild concerns for protection of the environment to promote her own personal environmental value preferences.
Secondly, most of the pleadings which Attorney Burton filed in CT Page 9355 disobedience of the sullivans' instructions were filed not because she was concerned about the interests of her clients, but rather because she was concerned about protecting herself. Support for this conclusion lies in the fact that every overture which she made toward settlement included the requirement that she be given a personal release of claims for "costs and penalties" in addition to a release of her clients. Such conduct constitutes a violation of Rule 1.7 and 1.8(f)[17] and was clearly willful. "[O]ur rules of professional conduct are punctuated with exhortations that an attorney's loyalty to the client is to be undivided and unaffected by other interests that would impair the attorney's independent judgment." Jackson v. R. G. Whipple, Inc., 225 Conn. 705,727(1993).
Perhaps even more disturbing is Attorney Burton's characterization of this practice of insisting that a release of claims run to her as attorney as well as to her clients as "boilerplate". When the court inquired as to the meaning of the term and as to whether Attorney Burton made it a practice, in terminating a case, to include herself in a release of claims, her response was "there is nothing here to suggest that, your Honor". Such an answer was evasive and equivocal. The court construes the answer against Attorney Burton and infers from that testimony that it is her standard practice to exact from her opponents a dual release, that is, one for her clients and one for her. The mischief created by such a practice is readily evident in this case. The practice cannot be tolerated and must not continue.
B. The Court's Order of November 29, 2000.
The order issued directly to Attorney Burton in open court on November 29, 2000 was willfully disobeyed. In a transparent attempt to protect herself after the event occurred Attorney Burton filed a motion to vacate the order on December 12, 2000, which was of course, six days after the last day fixed for compliance. The motion purports to set forth justification for noncompliance. The effort at justification evades the issue and misses the point. If Attorney Burton harbored a bonafide belief that the order could have caused her to act unethically she was duty bound to move for relief from that order within the one week period set for compliance. Her failure to do so and subsequent noncompliance was an affront to the authority of the court. "We emphasize again that the court's orders must be obeyed; there is no privilege to disobey a courts order because the alleged contemnor believes that it is invalid.Particularly is this true of attorneys. We agree with the United States Court of Appeals for the Ninth Circuit when it said: "`An attorney who believes a court order is erroneous is not relieved of the duty to obey it. The proper course of action, unless and until the order is invalidated by an appellate court, is to comply and cite the order as CT Page 9356 reversible error should an adverse judgment result.'" Cologne v. West FarmsAssociate, 197 Conn. 141, 147 (1985). (Emphasis added).
The real reason for the noncompliance may be gleaned from the motion to vacate. It is obvious from a reading of the motion, when placed in the context of all of the evidence, that Attorney Burton was concerned that if she contacted the plaintiffs as ordered they would have instructed her immediately to drop their names from the case and therefore withdraw. Such an instruction inevitably would have exposed her as their attorney to claims for costs and fees at the hands of the defendants. What makes this so obvious is that at the time that Attorney Burton tiled the motion (December 12, 2000) both defendants had already advised her that they had no intention of seeking costs and fees against the plaintiffs as parties as distinguished from her, as attorney. Thus, not only did this constitute a blatant disobedience of the order of the court but it breached the most fundamental of duties owed by an attorney to the attorney's client, viz: the duty of undivided loyalty.
 III. Misrepresentations to the Court
A. As To Her Appearance
On August 29, 2000 Attorney Burton filed a motion to withdraw her appearance and herein alleged that "there has been a complete breakdown in communication between the plaintiffs and the undersigned." She reiterated that statement on the record before this court on several occasions. The evidence demonstrates clearly that this assertion was untrue at the time it was made and that Attorney Burton knew that it was untrue. The fact is that with respect to all plaintiffs other than the Sullivans and Hunters, none of them even knew that they were parties to the action and had no desire to prolong that status. Hence, they had no reason to communicate with Attorney Burton except to have their names dropped from the case. Certainly, there could have been no "breakdown" as to the Sullivans because they had instructed her to take no further action in the case. So, contrary to her assertion, there was no communication that any of the plaintiffs could have been interested in other than communication leading directly to a cessation of their participation. The so called "breakdown in communications" was simply Attorney Burton's way of describing her inability to persuade her clients to allow her to continue prosecuting the action. Such conduct was willful and violates Rule 3.3(a)(1)[18].
B. As to Gender Bias
CT Page 9357
On October 31, 2000 in response to her allegation of gender bias against the court, the court ordered Attorney Burton to file, within one week, an affidavit specifying in detail each instance of gender bias that she claimed the court engaged in during the trial of the case. On November 6, 2000 Attorney Burton filed a document entitled "Affidavit of Nancy Burton". Allegation 16 of that document states the following:
 "16. Both Lenore A. Sullivan and Patricia Hunter, plaintiffs, herein, who are women, commented to me about such preferential treatment and their disdain for what appeared to be a judicial attitude that was gender-bias against them and their attorney, a woman."
On December 21, 2000 Lenore Sullivan testified before the court she did not make any such statement to Attorney Burton. Rather, she said it was Attorney Burton who charged the court with male directed preferential treatment and gender bias. When on January 4, 2001 the court asked Attorney Burton exactly what Mrs. Sullivan and Mrs. Hunter had said in this regard, Attorney Burton evaded the answer with misleading statements concerning her many discussions with Mrs. Sullivan. Attorney Burton never answered the question and so the court is at liberty to accept Mrs. Sullivan's denial as the truth and does so without hesitation. This statement was a false statement of a material fact made knowingly and willfully with malevolent intent in violation of Rule 3.3(a)(1)[19]
C. As to Her Clients
In her limited contacts with her clients Attorney Burton endeavored to instill apprehension in them by warning them that the defendants were seeking to have sanctions imposed upon them when she knew or should have known from both defendants that they had no intention of seeking sanctions against them. Clearly, such a misrepresentation was motivated by her instinct for self protection because it was in her interest to keep the plaintiffs alarmed about their exposure to costs and fees so they would not withdraw without what she termed a "stipulated withdrawal", which of course, would have included her own personal release. Such a misrepresentation to her clients was, in effect, a misrepresentation to the court, first because it was repeated several times on the record and second because it undermines the trustworthiness of our adversary system. This statement was false when it was made and Attorney Burton knew or should have known of its falsity. The statement was material and therefore violates Rule 3.3(a)(1).[20]
 IV. Conduct Toward the Court
CT Page 9358
A. General
The court's disciplinary order of September 28, 2000 seems to have unleashed a barrage
of attacks upon the court, none of which were either authorized or ratified by any of Attorney Burton's clients. On October 31, 2000 she filed a motion to disqualify the court which complied with none of the requirements of Practice Book § 1-23 except that it was in writing.[21] In paragraph 10 she alleges that the court "manifested a serious prejudice against the undersigned". In paragraph 13 she alleges "in this matter and others, Judge Mottolese has manifested a bias and prejudice against the undersigned." At the hearing on the motion held that day she accused the court of "chilling" the rights of women attorneys representing parties injury trials by its order of September 28th.[22]
The following colloquy occurred:
THE COURT: I don't understand that point. I don't understand that point, Ms. Burton.
MS. BURTON: Yes your Honor, yes your Honor.
THE COURT: Women attorneys? What do you mean by that?
MS. BURTON: Well, I've noticed that in this court there are not women judges. I've noticed a very few women attorneys and I have noticed in this case male defendants. I have noticed that the Town of Monroe people who have been involved are all male. I have noted discriminatory conduct in this court that appears to be —
THE COURT: Discriminatory conduct in the court by whom?
MS. BURTON: Yes, your Honor. Uh, by your Honor. For instance, when I was in the ladies' during the proceedings that took place in this case, your Honor had the proceedings begin in my absence. That would be one small example, your Honor. But the fact that in these proceedings —
THE COURT: So are you accusing the court, you're accusing the Court of gender bias?
MS. BURTON: Well your Honor, I had — let me just say this, during our proceedings before your Honor when I had present at counsel table Lenore A. Sullivan, a woman; Patricia Hunter, a woman, both commented to CT Page 9359 me your Honor with all respect as to their perceptions concerning gender bias in this courtroom. I won't be more specific than that unless the Court directs it. But my
THE COURT: Well, I'm going to direct it —
MS. BURTON — statement is informed by that, your Honor.
THE COURT: — I'm going to direct it because that is one of the — I'm going to direct because I know of no more serious charge than can be leveled against the judicial authority than a charge of gender bias.
So I am going to order you to be more specific, and I'm going to order you to file an affidavit within one week specifying in detail each instance of gender bias that you claim the Court engaged in during that proceeding.
MS. BURTON: I will be very happy to, your Honor.
On November 6, 2000 Attorney Burton filed what purports to be an affidavit which she signed under "penalty of perjury". The contents of the document were not sworn to. Signing under "penalty of perjury" is not the functional equivalent of an affidavit because it does not satisfy the requirements of § 53a-157b.[23]
That document contained the following assertions:
13. By indefinitely postponing consideration of such motion, Judge Mottolese created the appearance of gender bias and in fact promoted gender bias by permitting Mr. Epstein to go unsanctioned for an indefinite period. (The motion referred to was Ms. Burtons Motion For Sanctions against the defendants' attorneys.)
14. I am aware of other conduct by Judge Mottolese and others at the Bridgeport Superior Court which gives the appearance of gender bias.
15. During proceedings in the above-captioned case, Judge Mottolese accorded preferential treatment to the defendants, males and their attorneys, males.
17. The plaintiffs established by overwhelming evidence that the motions to dismiss counts 1 and 2 of the complaint were without merit; Judge Mottolese's dismissal of counts 1 and 2 manifested bias and prejudice against Ms. Sullivan and Ms. Hunter because such decision completely discredited their testimony in favor of testimony by male witnesses which CT Page 9360 was not credible and, even if credible, was insufficient to support dismissal of counts 1 and 2. Such bias and prejudice may manifest gender bias.
The substance of these allegations were repeated in motions to disqualify on November 29, 2000, December 21, 2000, and a motion to suspend proceedings dated December 21, 2000. Moreover, Attorney Burton continued her attack on the court by devoting her entire brief of March 30, 2001 not to the issues which were pertinent to this proceeding but rather to a bitter attack on several members of our judiciary thereby making a mockery of this proceeding. The entire brief is reproduced in the footnote.[24]
B. Gender Bias
"Of all the charges that might be leveled against one sworn to administer justice and to faithfully and impartially discharge and perform all the duties incumbent upon me . . . a charge of bias must be deemed at or near the very top in seriousness, for bias kills the very soul of judging fairness". Pac-Tec, Inc. v. Amerace Corp., 903 Fed. F.2d 796 (Fed. Cir. 1990). Besides killing the soul, bias cripples the heart of a system whose lifeblood is equality before the law.
In accusing the court of gender bias Attorney Burton obviously did not heed the warning given to the bar by the Appellate Court in Evans v.Commissioner of Correction, 37 Conn. App. 672, 677 n. 6 when it cautioned counsel against making statements not intended to question the court's integrity but that might be construed in that manner
Unlike the appellant in Wendt v. Wendt, 59 Conn. App. 656, 694-695
(2000) none of Attorney Burton's four written motions to disqualify, nor indeed her oral motions to recuse, were timely filed or were accompanied by affidavits or good faith certificates mandated by § 1-23 of the Practice Book. Such vital omissions render the motions fatally defective. Norse Systems, Inc. v. Tingley Systems, Inc.,49 Conn. App. 582, 588 (1998).
 THE PLAINTIFFS By:_____________________ Nancy Burton, Esq. 147 Cross Highway Redding Ridge, Ct. 06876 Tel. 203-938-3952
Like Wendt, however, Attorney Burton's assertions are wholly conclusory and without factual support. It is plainly obvious that Attorney Burton's CT Page 9361 allegations of gender bias began only after the court adjudicated the underlying case against her clients and the court imposed disciplinary measures for violation of its order. Attorney Burton points to those adverse rulings to support her claim. "It is fundamental that adverse rulings do not themselves constitute evidence of bias". State v.Fullwood, 194 Conn. 573, 582 (1984).
But Attorney Burton was apparently undeterred by the stern warning which the court reiterated to the bar in Wendt when Chief Judge Lavery noted that the cases which the court cited were "relevant for the seriousness with which courts take these charges and provide a cautionary warning for any member of the bar who may in the future consider making an unsupported line of attack". Id. at 696.
This particular judge recognizes the danger that attends any inquiry and ultimate adjudication of charges made against himself personally. Such charges cannot, however, be separated from an attack against the court as an institution of justice. Attorney Burton's attack covers a broad range of targets and strafes several other judges of this court. The court has weighed very carefully the propriety of self adjudication in this matter when balanced with the alternative of involving a coordinate judge of the court to conduct a de novo type hearing on the issue. The court has elected to retain jurisdiction of the claim simply because it is so utterly devoid of merit that no reasonable person could disagree on that point. It is not the fact that the author of the charge disagrees that is relevant, it is the outright repudiation of the claim made by the author's own clients, the Sullivans.
Judge Lavery captured the seriousness of an unfounded charge of gender bias in the following language.
"A charge of gender bias against a trial judge in the execution of his or her duties is a most grave accusation. Its strikes at the heart of the judiciary as a neutral and fair arbiter of disputes for our citizenry. Such an attack travels far beyond merely advocating that a trial judge ruled incorrectly as matter of law or as to a finding of fact, as is the procedure in appellate practice. A judge's personal integrity and ability to serve are thrown into question, placing a stain on the court that cannot easily be erased." Id. at 697.
These allegations of gender bias are not only totally false, but more serious than their falsity. is the compelling inference that they were contrived for the purpose of advancing Attorney Burton's personal agenda. Two examples will illustrate the point.
In paragraph 3 of Plaintiffs Supplemental Brief of March 30, 2001 CT Page 9362 Attorney Burton associates the undersigned with an "ongoing judicial vendetta" which involves Judges Moraghan, Stodolink, Mihalkos and an attorney named Gary R. Michael. First, the undersigned doesn't even know Attorney Michael. While the undersigned is of course acquainted with the judges, such an allegation is outrageous. In this connection, the court notes that Attorney Burton has accused these very judges of "the stark appearance of judicial corruption" and that the Statewide
Grievance Committee has taken jurisdiction over Judges Moraghan and Milhalkos's complaint concerning this charge. Burton v. StatewideGrievance Committee, 60 Conn. App. 698 n. 8 (2000).
It would appear then that in an effort to bolster her defense against the complaint before the Grievance Committee, Attorney Burton has broadened her conspiracy theory to include the undersigned. Also, in an effort to hold the judicial system responsible for her reversals in this action she has accused Judges Skolnick and Moran of "promot(ing] the abuse of power and abuse of the plaintiffs and their counsel". The total absence of any such complaint by a single plaintiff, whether that plaintiff testified during this phase of the proceeding or not, makes it clear that Attorney Burton strikes out against these judges for no reason other than her dissatisfaction with their rulings. She has implicated unnamed court personnel in her pervasive allegation of gender bias by asserting that "this affidavit does not represent an exhaustive account of instances of gender bias by Judge Mottolese and others at the Bridgeport Superior Court." (emphasis added).
By engaging in these practices Attorney Burton has committed serious offenses against the institution of our Connecticut judicial system in that she has impugned its integrity, undermined public confidence in the system as a minister of justice, has degraded it and brought it into public disrespect and dishonor. In short, Attorney Burton has demonstrated that she has no respect for the very system in which she practices her profession.
Attorney Burton's claims of gender bias constitute violations of several of our rules of professional conduct. The first is Rule 8.2[25]
which in view of the foregoing discussion needs no further explication. This court holds that such conduct also violates Rule 8.4(3) and (4).[26] Because such statements are palpably untrue, Attorney Burton acted dishonestly in making them. The harm which they have inflicted on the administration of justice is incalculable. Such violations were clearly willful. Parenthetically, the only actual evidence of the practice of gender bias in the case came through the sworn testimony of Lenore Sullivan who stated that Attorney CT Page 9363
Burton displayed "a lot of hostility . . . toward men and the judicial system". "An attorney's charge of judicial bias inherently obstructs the judicial function by undermining the court's ability to regulate the trial." In re: Gustafson, 650 Fed F.2d 1025, (1985). Disrespectful and confrontational remarks to a judicial authority in and of themselves constitute a violation of Rule 3.5(3).[27] United States v. Engstrom, 167 3d 1006, [16 F.3d 1006] (9th Cir. 1994). Attorney Burton's conduct clearly was intended to disrupt the court simply because it was calculated to vindicate her personal grievances rather than to further the ends of justice.
 Competence
The basic principle which is presumed to underlie every aspect of an attorney's professional life is competence.[28] A lawyer is expected to know the rules of the court before which the lawyer practices. Additionally, the requisite familiarity with well settled legal principles extends to matters of procedure.[29]
This particular evaluation of Attorney Burton's competence is made not primarily from the perspective of its effect upon her clients but rather from the standpoint of its effect upon the bedrock principle which demands that an attorney act at all times with professional respect for the civil justice system.
On September 25, 2000, Attorney Burton filed a motion for continuance of the proceeding scheduled for September 28. The motion was not filed on the prescribed JD form CV21 and therefore contained incomplete information, thereby impeding adjudication. Thereafter, on four separate occasions Attorney Burton filed motions to disqualify the court, each of which failed to satisfy the requirements of Practice Book § 1-23 in every respect save that they were in writing.[30] On other occasions she moved orally for the court's recusal and for mistrial, which motions undeniably fail to comply with our rules of practice. Her willful disdain for the corrective warnings of this court and other courts demonstrates her inability or unwillingness to abide by the rules.
Attorney Burton has demonstrated an appalling lack of knowledge of the nature of an affidavit, namely, that an affidavit is a written statement made before someone authorized to administer an oath.
On numerous occasions both while acting as an attorney and also as a witness Attorney Burton ignored the court's warnings to cease speaking when an objection was made and an opposing attorney was speaking. Such disruptive behavior is inexcusable by a practitioner of Attorney Burton's experience. At numerous places during the proceeding she persisted in her CT Page 9364 efforts to produce documents that had already been declared inadmissible, despite the admonition of the court.
Acting as her own attorney while acting as a witness in her own behalf, she took exception to the court's order that she answer a specific question propounded by Attorney Epstein, knowing, or at least chargeable with knowledge that the necessity for an exception was eliminated from our rules of practice several years ago. See P. B. Ch. 5. Furthermore, Attorney Burton's testimony is interspersed with evasive, non responsive answers to questions which were designed to assist the court in it's fact finding mission. The court's inquiry was neither an adversary proceeding nor a civil action. Attorney Burton therefore had a heightened obligation be candid and forthright with the court in its effort to find the facts. Her behavior became so obstructive that the court was constrained to warn her that it would draw an adverse inference from all evasive answers and now feels free to do so.
These infractions of the rules of practice, when taken together with Attorney Burton's numerous transgressions of the Rules of Professional Conduct, compel a finding that Attorney Burton's professional performance fell below the acceptable standard of competence envisioned by Rule 1.1.
A hearing will be held before the undersigned on August 14, 2001 at courtroom SC to determine the proper sanction or sanctions to be imposed upon Attorney Nancy Burton for the violations of the Rules of Professional Conduct hereinabove found by the court. The range of sanctions available to the court include but are not limited to those set forth in P.B. § 2-37, 2-44, G.S. § 51-84, suspension, disbarment and counsel fees.
By the Court,
 ________________ MOTTOLESE, JUDGE
 Endnotes
1. Numerous plaintiffs have withdrawn from this action. On August 29, 2000, the undersigned moved to withdraw her appearance on behalf of the plaintiffs because of a breakdown in Communications.
2. Although the plaintiffs' counsel ordered transcripts of numerous portions of the proceedings in January 2001 for the purpose of achieving the ability to cite with particularity to pertinent portions of these proceedings, with one exception the Office of the Court Reporter has failed to comply with the request, which is of a continuing nature. CT Page 9365 Accordingly, statements contained herein are based upon recollection only by which may be flawed. Therefore, the plaintiffs reserved the opportunity to clarify any potential flaws upon receipt of the said transcripts and to expand upon their brief with citations to the record when it becomes available.